JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-2956-GW(FFMx) | Date | December 12, 2019 |
|---|---|---|---|
| Title | *Justine Tanjaya v. The Regents of The University of California, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Carol L. Gillam | Usha C. Vance |
| | Hailyn J. Chen |

**PROCEEDINGS:** DEFENDANT THE REGENTS OF THE UNIVERSITY OF CALIFORNIA'S MOTION TO DISMISS SECOND AMENDED COMPLAINT [35]

DEFENDANT DR. SOTIRIOS TETRADIS'S MOTION TO DISMISS SECOND AMENDED COMPLAINT [42]

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would GRANT the University's and Tetradis's Motions to Dismiss the Second Amended Complaint as delineated in the ruling.

|  | : | 05 |
|---|---|---|
| | Initials of Preparer | JG |

***Tanjaya v. Regents of the Univ. of Cal. et al.***; Case No. 2:19-cv-02956-GW-(FFMx)
Tentative Ruling on Defendant Regents of the University of California's Motion to Dismiss the Second Amended Complaint

I.  **Background**

    A.  Factual Background

Justine Tanjaya, DDS ("Plaintiff") sues The Regents of the University of California ("Regents" or "the University" or "Defendant"), Solitirios Tetradis ("Tetradis") and Does 1 through 25, inclusive (collectively referred to as "Defendants"), for: (1) sex discrimination in violation of Title IX, 20 U.S.C. § 1681 *et seq.* ("Title IX"); (2) retaliation in violation of Title IX; (3) sex discrimination in violation of Cal. Gov. Code § 11135; (4) hostile environment and quid pro quo harassment in violation of Title IX; (5) assault; and (6) battery.[1]  *See generally* Second Amended Complaint ("SAC"), Docket No. 29.  Plaintiff alleges the following relevant facts:

Plaintiff is an Asian-American woman pursuing her doctorate in oral biology.  *See id.* ¶ 3.  She commenced her studies at the UCLA School of Dentistry in 2017.  *See id.* ¶ 12.  On or about April 13, 2018, Plaintiff met with UCLA Senior Associate Dean and Professor Soltirios Tetradis, DDS, Ph.D ("Tetradis") in his office, hoping for guidance and constructive advice in handling some issues with her research mentor, Dr. Kang Ting ("Ting").  *See id.* ¶ 13.  After instructing Plaintiff to close the office door, Tetradis asked Plaintiff to forward email messages between her and Ting.  *See id.* ¶¶ 13-14.  Plaintiff was hesitant, but Tetradis became insistent, demanding and reaching for her phone.  *See id.* ¶ 14.  Tetradis began to stroke Plaintiff's hand, making her feel extremely uncomfortable.  *See id.*  He moved closer to Plaintiff under the pretext that he could not read her phone well, eventually moving so close that his legs touched hers, though she tried to move away.  *See id.* ¶¶ 14, 16. Tetradis raised his voice, repeatedly demanding that Plaintiff send him the email chain with Ting or there would be ramifications.  *See id.* ¶ 15.  Plaintiff began to cry and feared that no one would hear her if she cried for help.  *See id.*  Tetradis asked if Plaintiff had anything else that would expose Ting in a negative light.  *See id.* ¶ 17.  Plaintiff replied that she did not.  *See id.*  Tetradis then asked if Ting ever touched Plaintiff inappropriately, but Plaintiff said her only issues with Ting were related to research expectations.  *See id.*

---

[1] It appears that Plaintiff brings all of the causes of action against the Regents but only claims Four through Six against Tetradis.  *See generally* SAC.

Tetradis said Plaintiff would not be able to graduate from the doctoral program without his help and that if she cooperated with him he would help her produce a written agreement on how to complete her remaining clinical orthodontic and Ph.D. training in a reasonable time. *See id.* ¶ 17. Because Tetradis was the Senior Associate Dean, this caused Plaintiff fear and frustration. *See id.* ¶ 19. She felt both sexually harassed and academically threatened. *See id.* After leaving the meeting, Plaintiff emailed Tetradis that she had no intention of reporting anyone or complaining about the program. *See id.* ¶ 20.

On April 18, 2018, Plaintiff met with Tetradis again in his office, alone behind closed doors. *See id.* ¶ 21. Tetradis pressured Plaintiff to file a Title IX claim against Ting saying he would report it even if she did not agree. *See id.* Tetradis told Plaintiff that he and Dean Paul Krebsbach ("Krebsbach") were much more powerful than Ting, and that the University, including the Title IX office were on Tetradis's side. *See id.* ¶ 21. Tetradis also boasted that he was good friends with the Title IX Coordinator, Mohammed Cato ("Cato") and could bring files to Cato anonymously. *See id.* ¶ 22. Unbeknownst to Plaintiff, Tetradis had already falsely reported Ting for committing a Title IX violation against Plaintiff. *See id.* ¶ 21.

During the meeting, Tetradis began to stroke Plaintiff's back and arms, perhaps under the guise of comforting Plaintiff, but Plaintiff understood it as a sexual assault. *See id.* ¶ 23. Plaintiff but was too afraid of Tetradis and his power to file an immediate complaint. *See id.* ¶¶ 24.

By May 31, 2018, Plaintiff cut off all communication with Tetradis and resigned from any lab assignment he had pushed her into. *See id.* ¶ 24. Tetradis repeatedly demanded that Plaintiff come to his office, threatening that her actions would negatively impact the continuity of her studies. *See id.* ¶ 25. Tetradis reached out to various administrative employees to track Plaintiff down and unexpectedly came to the orthodontic clinic where she was working. *See id.*

Plaintiff reported the assault and harassment from Tetradis to Dr. Ting, and another member of the School of Dentistry's leadership, Dr. Won Moon, and she believes they asked Tetradis to "stop bothering Plaintiff." *See id.* ¶ 26. On June 25, 2018, Plaintiff filed a Title IX complaint against Tetradis. *See id.* ¶ 27. She submitted a detailed declaration regarding the events on July 15, 2018 and was interviewed on July 23, 2018. *See id.* UCLA assured Plaintiff of its non-retaliation policies. *See id.* ¶ 28. Although Title IX complaints were supposedly confidential, an official outside the Title IX office had a copy of Plaintiff's sworn statement and questioned her about it in a surprise meeting. *See id.*

Regents failed to promptly investigate Plaintiff's Title IX complaint and permitted Tetradis to intimidate witnesses and prevent an investigation from proceeding. *See id.* ¶ 30. On or about August 6, 2018, Plaintiff sent an email to Vice Chancellor Jerry Kang ("Kang"), and all department chairs and senior leaders complaining about the pace of the investigation of her case, the fact that she was not protected, and the fact that Dean Kresbach ("Kresbach") and Tetradis had been harassing, intimidating and retaliating against faculty who supported Plaintiff. *See id.* ¶ 31. On August 7, 2018, Plaintiff emailed Kang, Kresbach and others to complaint about the Title IX investigator, Mohammed Cato's ("Cato") bias in the handling of her case. *See id.* ¶ 32. On August 10, 2018, Plaintiff made a written complaint of retaliation from Dr. Tetradis to Kang and Cato. *See id.* ¶ 33. On August 14, 2018, Kang emailed Plaintiff to inform her that he had concluded that Cato was not biased and there was no need for him to recuse himself from her investigation. *See id.* ¶ 34.

Members of Plaintiff's Ph.D. committee were told to hold her to a higher standard than other students. *See id.* ¶ 29. On October 8, 2018, Dr. Flavia Pirih tried to fail Plaintiff. *See id.* ¶ 35. Plaintiff believes this was done at Tetradis' behest. *See id.* On October 9, 2018, Tetradis sat directly in front of Plaintiff in the cafeteria, despite there being other empty chairs and tables. *See id.* ¶ 36. Plaintiff learned that the oral biology program had not forwarded her paperwork to her reconstituted Ph.D. committee. *See id.* ¶ 37. On October 13, 2018, Plaintiff emailed Vice Provost Dean Garrell regarding continuing harassment, abuse of power, and intimidation she experienced from members of the oral biology administration. *See id.* ¶ 38. Tetradis showed up at Plaintiff's clinic another time without any purpose, just to stare at and intimidate her. *See id.* ¶ 39. In January of 2019, Kresbach announced that Ting was no longer the chair of orthodontics. *See id.* ¶ 39. Plaintiff believes this was in retaliation for his standing up for Plaintiff. *See id.* On June 12, 2019, Dr. Igor Spiegelman unexpectedly attended Plaintiff's Ph.D. defense presentation. *See id.* ¶ 40. Plaintiff believed this was at the behest of Tetradis and found this intimidating. *See id.*

Six months passed with no action by the University on Plaintiff's complaints despite repeated requests for an update and complaints of retaliation. *See id.* ¶ 41. As a proximate result of Defendants' conduct, Plaintiff has been severely damaged in her ability to focus her efforts on successful completion of her doctorate. *See id.* ¶ 42. Plaintiff has sustained emotional harm and damage to her professional reputation. *See id.* As a result of Defendants' conduct, Plaintiff suffered and continues to suffer severe emotional and mental distress, anguish, humiliation,

3

embarrassment, fright, shock, discomfort and anxiety, although the exact nature, duration, and extent of such injuries are presently unknown to Plaintiff. *See id.* ¶ 43.

Defendant is subject to the provisions of Title IX; and Plaintiff alleges that Defendant's conduct was willful, purposeful, and unlawful, and done in accordance with the policies and practices of Defendant's operations. *See id.* ¶¶ 45-46. The University is a public agency receiving funding from the State of California, including but not limited to budget appropriations, payments under Denti-Cal and student aid money, and thus, an entity governed by Cal. Gov. Code § 11135. *See id.* ¶ 60.

### B. Procedural Background

On September 5, 2019, the Court dismissed Plaintiff's first amended complaint without prejudice. *See* Final Ruling, Docket No. 28. Plaintiff filed the SAC in accordance with the Court's order. *See generally* SAC. The Regents' filed a motion to dismiss the SAC. *See* Defendant Regents of the University of California's Notice of Motion and Motion to Dismiss Second Amended Complaint ("Motion"), Docket No. 35. Plaintiff filed an opposition. *See* Plaintiff Justine Tanjaya's Opposition to Notice of Motion and Motion to Dismiss Second Amended Complaint ("Opp'n"), Docket No. 39. Regents filed a reply. *See* Defendant Regents of the University of California's Reply Brief in Support of Motion to Dismiss First Amended Complaint ("Reply"), Docket No. 26.

The Court held a hearing on the Motion on November 14, 2019. *See* Docket No. 45. At the hearing, the Regents agreed to file the investigative report compiled as part of the University's investigation into Plaintiff's complaints. The Court indicated that it would postpone ruling on the Motion so that it could review the report. The Report was filed on December 2, 2019. *See* Investigation Report, Docket No. 54-2.

## II. Legal Standard

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

4

In deciding a 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion"). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted).

## III. Analysis

The Regents' Motion seeks to dismiss all of the causes of action against it.[2] As to the First, Second and Fourth causes of action which are based the federal Title IX statute, they contend that Plaintiff has failed to sufficiently allege that the University itself engaged in the misconduct that gives rise to the Title IX violations as required under the applicable law. As to Plaintiff's state law claims (*i.e.* causes of action Three, Five and Six), the Regents argue that this Court should decline to exercise supplemental jurisdiction. The Motion raises other contentions, but if this Court agrees with the University's above arguments, it need not address the latter.

### A. Title IX Claims

The Regents argue that Plaintiff's federal Title IX claims fail because Plaintiff has once

---

[2] The Regents initially argue that the SAC should be dismissed in its entirety because it was purportedly filed 22 days after this Court gave her 21 days to file an amended complaint. *See* Motion at 6. The Court declines to dismiss on that ground − as the sanction would far exceed the transgression, and the Defendant has not suffered any prejudice as a result of the one day delay.

again not sufficiently alleged factual averments which demonstrate that the University itself engaged in any misconduct. *See* Motion at 6. Specifically, they assert that Plaintiff has failed to allege facts sufficient to conclude that the University committed (or was deliberately indifferent to) the purported sex discrimination, harassment and/or retaliation. Thus, the University argues, her Title IX claims for sex discrimination and hostile environment/quid pro quo must be dismissed (claims one and four). *See id.* at 7-9. The University also asserts that Plaintiff has failed to state a claim for retaliation because she has not plausibly alleged that the University (as opposed to an individual) retaliated against her, and she has not pled facts demonstrating that she was retaliated against because she complained of sex discrimination. *See id.* at 15-18. Plaintiff counters that she has demonstrated deliberate indifference by alleging that she made a Title IX complaint, the University's response was clearly unreasonable, and that she continued to be harassed by Tetradis and Kresbach, and was discouraged from pursuing her investigation. *See* Opp'n at 3-6. Plaintiff also argues that the University itself retaliated against Plaintiff when it's employees took adverse action against her, and when Tetradis was allowed to come near Plaintiff. *See id.* at 7. Furthermore, Plaintiff argues that the deficiencies in the investigation themselves constituted retaliation. *See id.* at 7-8.

        1.  *Applicable Standard*

Because Title IX was enacted under the Spending Clause, private actions are available only when funding recipients, such as school districts, had adequate notice that they could be held liable for the conduct at issue. *See Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 640 (1999). The Supreme Court clearly indicated the standard for holding an entity responsible for Title IX discrimination in *Gebser v. Lago Vista Indep. Sch. Dist.*:

> Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.
>
> We think, moreover, that the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme

> presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference. Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions. Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation.

524 U.S. 274, 290-91 (1998) (citations omitted).

Academic institutions are only liable for harassment by teachers and/or professors if they: 1) had actual knowledge of the harassment and 2) responded to that knowledge with deliberate indifference. *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 739 (9th Cir.2000). In determining whether a Plaintiff has adequately pled a Title IX claim, the Court must determine whether, taking the allegations in the light most favorable to Plaintiff, it could conclude that an "appropriate person," defined as "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" had "actual knowledge of the discrimination and failed to adequately respond." *Gebser*, 524 U.S. at 290. A school's response to reported harassment will be deemed "deliberately indifferent" only if it is clearly unreasonable in the light of known circumstances. Davis 526 U.S. at 648. Moreover, the institution's deliberate indifference must "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645. In addition, to be actionable, the conduct must be so "severe, pervasive, and objectively offensive," that it effectively deprives the victim of access to the educational opportunities or benefits provided by the school. *Id.* at 650. As further stated in *Mansourian v. Regents of the Univ. of Cal.*, 602 F.3d 957, 966-67 (9th Cir. 2010):

> In *Gebser*, the Court held that principles of *respondeat superior* and constructive notice are inadequate to impose Title IX liability on a school district for a teacher's sexual abuse of a high school student. *Id*. at 285. Noting that Title IX's express enforcement scheme, termination of federal funding, requires "an opportunity for voluntary compliance" before suspending or terminating funding, *see* 20 U.S.C. § 1682, *Gebser* held that the judicially implied private right of action similarly should not impose liability "without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id*. at 289. Monetary damages premised on constructive notice or *respondeat superior* for sexual harassment, the Court held in *Gebser*, would entail a risk that "the recipient of funds was unaware of the discrimination." *Id*. at 287.

> Retaliation is also considered a form of discrimination under Title IX. *See Jackson v.*
7

7

*Birmingham Bd. of Ed.*, 544 U.S. 167, 173 (2005). When an institution "retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex' in violation of Title IX." *See id.* at 174. "Retaliation is, by definition, an intentional act." *See id.* at 173-74. Thus, as with claims of harassment, a University can only be found liable for retaliation undertaken by individuals acting in their own capacity, such as professors, if it was aware of the retaliation and failed to respond in a reasonable manner, causing further retaliation. *See Power ex rel. Power v. Gilbert Public Schs.*, No. CV 07-2584-PHX-JAT, 2009 WL 5185297, *5 (D. Ariz., Dec. 22, 2009).

As such, for all three Title IX causes of action, Plaintiff must plead sufficient facts to allege that the University itself performed the acts of (or had actual knowledge of and failed to take appropriate corrective action as to) the harassment and/or retaliation. Additionally, Plaintiff must plead facts showing that the University was deliberately indifferent to the harassment/retaliation, and that the alleged indifference subjected Plaintiff to further discriminatory treatment. *See Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006).

  2. *Analysis*

    a. *Sex Discrimination/Hostile Environment Claims*

Plaintiff's sex discrimination and hostile environment claims are once again insufficiently alleged in the SAC. Given the allegations in the SAC, the Court finds no reason to believe that the University's response to Plaintiff's complaint was unreasonable. The University conducted an interview of Plaintiff within a month of her filing a complaint and was clearly in contact with members of the faculty regarding the investigation. *See* SAC ¶¶ 27, 32. Plaintiff complains that the University did not take action on her complaints until she filed a lawsuit, however, she filed the lawsuit eight months after her initial report to the University. The fact that the investigation was not completed in less than eight months is not enough to demonstrate deliberate indifference. *See Oden v. Northern Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) (finding that nine-month delay in convening a hearing was not unreasonable, even where human resources manual required a hearing within 30 days of the filing of a complaint).[3] The University began investigating within weeks of Plaintiff's initial complaint. *See* SAC ¶¶ 27, 32. At that point Plaintiff had already "cut off all communication" with Tetradis. *See id.* ¶ 25. Thus, it does not appear that the University had any need to take immediate measures to protect Plaintiff from further harassment.

---

[3] The Court recognizes that *Oden* was decided in a motion for summary judgment context.

The Court finds no allegations in the SAC to suggest that the University's response to Plaintiff's complaint was unreasonable.

Moreover, Plaintiff does not allege sufficient facts to show that the University's delay in investigating her case caused Plaintiff to be subject to continuing harassment. *See generally* SAC. Plaintiff allegedly reported her claims of sexual harassment to the University's Title IX office on June 25, 2018. *See* SAC ¶ 27. Thus, the University itself could only be liable for sexual harassment that occurred after that date. However, Plaintiff's SAC contains no allegations of sexual harassment occurring after June 25, 2018. *See generally id.* Plaintiff does allege that Tetradis at one point sat at a table nearby her in the University cafeteria, *see id.* ¶ 36, and that Tetradis showed up at an on-campus dental clinic where she was working. *See id.* ¶ 39. Tetradis' continued presence on campus alone does not constitute discrimination for which the University can be held liable under the circumstances alleged.

Perhaps there could be some circumstance in which the University could be liable for allowing an alleged perpetrator of sexual harassment or sexual assault to remain on campus during an investigation, but that is certainly not the case here. Plaintiff alleges no facts from which the Court could conclude that Plaintiff was somehow endangered, or otherwise significantly impacted by Tetradis' presence on campus. *See generally* FAC. If the Court were to find the University liable for violations of Title IX based on Tetradis' having been in the same room as Plaintiff on only two occasions following her complaint, it would essentially mean that the school is liable *no matter what*, so long as they do not ban a professor from campus immediately following an allegation of sexual harassment. But Title IX does not require "administrators to engage in particular disciplinary action," when they receive a complaint of sexual harassment, and the Supreme Court has instructed that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999). Given that Tetradis' presence in the cafeteria and a dental lab are the only allegations that could possibly constitute harassment by Tetradis after Plaintiff's complaint to the University, the University cannot be liable for Plaintiff's sex discrimination or hostile environment claims.

However, the Court also cognizant of the fact that the University herein did not do as much as they could have in regards to responding to Plaintiff's complaint. For example, in *Oden*, the actions initially taken by the educational institution were much more thorough. As described by

the court:

> The College began to act as soon as it became aware of Plaintiff's allegations. Two counselors were assigned to Plaintiff to provide psychological and practical support; they met with her more than a dozen times; they assisted her in filing a formal complaint; and they helped her drop [the accused teacher's] class immediately. After the complaint was filed, the College served it on [the teacher]. He was instructed not to have any contact with Plaintiff. Eventually a hearing took place, Plaintiff was believed, and [the teacher] was significantly disciplined.

440 F.3d at 1089. The question, however, is not whether the University did everything that it could have, but rather it is whether that which was done by the University was sufficient for purposes of Title IX.

In its November 14, 2019 Tentative Ruling the Court indicated that a significant factor in determining whether to dismiss Plaintiff's discrimination and hostile environment claims would be the adequacy of the University's investigation into her complaints. *See* Tentative Ruling on Defendant's Motion to Dismiss Second Amended Complaint ("Tentative Ruling"), Docket No. 45. The Court has reviewed the investigative report filed by the University and would conclude that the University conducted a robust and thorough investigation of Plaintiff's claims. *See generally* Investigation Report. The University's investigation included multiple interviews with the Plaintiff and Dr. Tetradis as well as the analysis of a large set of documentary evidence. *See generally id.* It concluded in an exhaustive seventy-one-page report with hundreds of pages of relevant exhibits. *See generally id.* Although Plaintiff was no doubt dissatisfied with the conclusions reached by the report, there can be no doubt that the University conducted a thorough investigation. Thus, the Court would find that the University's response to Plaintiff's sexual harassment complaint was sufficient for Title IV purposes.

### b. *Retaliation Claim*

Plaintiff makes a separate Title IX claim for retaliation. *See generally* SAC. Plaintiff has also failed to state a claim for retaliation. Plaintiff does not allege any facts from which the Court could conclude that the University itself retaliated against her for filing a Title IX complaint. *See generally* SAC. Instead, Plaintiff alleges that Tetradis and "others associated with him" retaliated against her. *See id.* ¶ 28. Plaintiff alleges that "members of Plaintiff's Ph.D. committee were told to hold her to a higher standard than other students," but does not allege who told the committee to do this. Thus, the Court cannot conclude that the University itself was responsible for such conduct. Given that Plaintiff alleges retaliation from members of the faculty, Plaintiff once again

10

must allege facts to show that the University was aware of the retaliation and was deliberately indifferent.

Plaintiff alleges that she emailed the Vice Chancellor to complain about retaliation on August 6, 2018, however the complaint focused on retaliation against "faculties who firmly supported" Plaintiff, not retaliation against Plaintiff herself. *See id.* ¶ 32. Plaintiff also alleges that she made a written complaint of retaliation by Tetradis to the Title IX investigator on August 10, 2019. *See id.* ¶ 33. From this vague allegation it is unclear if Plaintiff was complaining about retaliation against her, retaliation against faculty who supported her, or both. The Court will assume, for the sake of this Motion, that the complaint included allegations of retaliation against Plaintiff. Plaintiff does not allege any facts, however, that would lead the Court to believe that the University was deliberately indifferent to her retaliation claims. As with her harassment claims a 6-8 month delay in concluding the investigation is not alone sufficient to show deliberate indifference.

Moreover, Plaintiff does not allege sufficient facts to show that she was subject to retaliation after the filing of her August 10, 2019 complaint, for which the University realistically could have been on notice. To start, the Court would not find that Tetradis' presence either in the cafeteria or in Plaintiff's lab could possibly be construed as "retaliation" against Plaintiff by the University. Plaintiff also alleges that Dr. Flavia Pirih "tried to fail Plaintiff," and that Plaintiff believes this was at Tetradis' request. *See id.* ¶ 35. Additionally, Plaintiff alleges that Dr. Igor Spigelman "unexpectedly showed up to attend Plaintiff's Ph.D. defense presentation." *See id.* ¶ 40. If Plaintiff were able to prove that Pirih tried to fail Plaintiff at the request of Tetradis, that would likely constitute an act of retaliation, but the Court would not find that a University professor observing a Ph.D. presentation could possibly constitute legally cognizable retaliation. Thus, the only plausible allegation of retaliation alleged following Plaintiff's report to the Title IX office is Dr. Flavia Pirih's attempt to fail Plaintiff. It is unclear to the Court however, how the University could possibly be responsible for Pirih's alleged conduct. Plaintiff does not allege that she actually did fail the class, or that the University possibly could have been aware of Pirih's *attempt* to fail Plaintiff. The University was only on notice that Tetradis had allegedly retaliated against Plaintiff. It would be completely unreasonable for the Court to conclude that somehow the University became responsible for monitoring all interactions between Plaintiff and *other* faculty when she complained of Tetradis' retaliatory conduct.

11

Thus, the Court would dismiss Plaintiff's Title IX claims for sex discrimination, retaliation, and hostile environment against the University. The Court would dismiss these claims with prejudice, given that a review of the University's investigative report demonstrates that the University's response to Plaintiff's complaint was sufficient to satisfy Title IX.

Plaintiff has conceded that her Title IX causes of action cannot be brought against individual defendant Tetradis. *See* Plaintiff's Opposition to Defendant Tetradis's Motion to Dismiss, Docket No. 46 at 3. Therefore, that claim against Tetradis is dismissed and the only remaining causes of action against him are under state law.

    B. <u>State Law Claims</u>

It is well established that "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Thus, the Court would decline to exercise supplemental jurisdiction over her state law causes of action and dismiss Plaintiff's remaining state law claims without prejudice.

**IV.**   **Conclusion**

Based on the foregoing, the Court would **GRANT** the University's and Tetradis's Motions to Dismiss the Second Amended Complaint as delineated above.